**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL BELDING,

    *Plaintiff,*

v.

DAVID RUSSO, sued in his official and
individual capacities; ZACHARY SAMS,
sued in his individual capacity; and
Greene County, Pennsylvania,

    *Defendants.*

Civil Action No. __2:23-cv-2148__

**Complaint and Jury Demand**

## COMPLAINT FOR DECLARATORY AND RETROSPECTIVE RELIEF

Plaintiff Michael Belding ("Mr. Belding") hereby sues David Russo ("Russo"), individually and in his official capacity as District Attorney for Greene County; Zachary Sams ("Sams"), individually; and Greene County, Pennsylvania ("Greene County" or the "County") (collectively, the "Defendants") for their deprivation of Mr. Belding's rights under the First and Fourteenth Amendments to the United States Constitution.

### Introduction

1.   The most essential imperative for any government leader is to resist the ease with which absolute power can corrupt absolutely. To Greene County's detriment, neither District Attorney David Russo nor former Chief Detective Zachary Sams were up to this task.

2.      Abusing his power as the District Attorney for Greene County, Pennsylvania, Russo conspired with Sams to persecute perceived opponents, including those within their own government.

3.      Plaintiff Michael Belding was no exception. After Mr. Belding, a Greene County Commissioner, shed light on Russo's corrupt practices, Russo and Sams publicly harassed, threatened, investigated, and brought false criminal charges against Mr. Belding. Upon learning of Russo's actions, the Pennsylvania Attorney General's Office swiftly withdrew all charges.

4.      This lawsuit is now filed to vindicate Mr. Belding's constitutional rights.

## Jurisdiction and Venue

5.      This is a civil rights suit brought under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983.

6.      Mr. Belding seeks declaratory relief and compensatory and punitive damages. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

7.      Venue is proper in this Court under 28 U.S.C. § 1391.

## The Parties

8.      Plaintiff Michael Belding is a citizen of the United States and a current resident of Greene County, Pennsylvania. He is also the duly elected Chairman of the Greene County Board of Commissioners. His constitutional rights were violated when

the Defendants abused their power and office to disparage, threaten, and bring criminal charges against Mr. Belding in retaliation for his constitutionally protected speech.

9.      Defendant David Russo is the current District Attorney ("DA") for Greene County, Pennsylvania. He has served in this capacity since January 6, 2020. While in this role, Russo used his power as District Attorney to threaten, falsely investigate, and fabricate criminal charges against Mr. Belding—and other Greene County community members—in retaliation for constitutionally protected activities. At all times relevant to this Complaint, Russo was acting within the course and scope of his employment and under the color of state law.

10.     Russo promoted Defendant Zachary Sams to Chief Detective for Greene County in July 2022, and he continued in this role until his resignation on August 4, 2023. While a Detective and Chief Detective, Sams knowingly pursued false charges against Mr. Belding—and other Greene County community members—in retaliation for constitutionally protected activities. At all times relevant to this Complaint, Sams was acting within the course and scope of his employment and under the color of state law.

11.     Defendant Greene County is a sixth-class Pennsylvania County Government located at 93 East High Street, Waynesburg, PA 15370. As District Attorney, Russo is a final policymaker for the County. As such, his actions described in this Complaint represent official Greene County policy.

## Factual Allegations

### Mr. Belding has committed his life to public service.

12.     For Plaintiff Michael Belding, Western Pennsylvania is home.

13.     When he was just eleven years old, Mr. Belding's family moved from Erie, Pennsylvania to Greene County, where he lived on a small farm and led his high school's 4-H and Future Farmers of America teams.

14.     After graduating from Waynesburg Central High School, Mr. Belding attended Penn State University and simultaneously trained with the United States Marine Corps through its Platoon Leaders Course.

15.     Mr. Belding swiftly advanced through the officer ranks of the Marine Corps and earned a Top Secret/Special Compartmented Information security clearance—the highest clearance available and awarded only to the most trustworthy.

16.     In 2004, as a Lieutenant Colonel, Mr. Belding commanded a helicopter squadron of twelve helicopters and 125 Marines and Navy sailors during a nine-month mission in Iraq. Under Mr. Belding's command, the squadron successfully completed every mission without a single injury or loss of aircraft.

17.     In 2008, as a Colonel, Mr. Belding was selected to command a Marine Aircraft Group, again deploying to Iraq. During this fourteen-month mission, with Mr. Belding commanding 128 aircraft and 2700 service members, the unit flew 70,000 flight hours and safely brought every sailor, soldier, and airman home to their loved ones.

18.    In addition to his duties as an officer, Mr. Belding also took advantage of opportunities to continue his education, earning a master's degree in management from Webster University and a master's in national security strategies from the National Defense University in Washington, D.C.

19.    Mr. Belding concluded his thirty-year military career as a Senior Fellow for the Institute for National Strategic Studies at the National Defense University.

### Mr. Belding continues his community service as Chairman of the Greene County Board of Commissioners.

20.    After retiring from military service in 2012, Mr. Belding and his wife decided it was time to return home to Greene County. Their two children were entering high school, and the Beldings wanted them to have the same community and experiences that Greene County had afforded Mr. Belding.

21.    The Beldings bought a small farm less than two miles from Mr. Belding's ageing father and settled back into life in Western Pennsylvania.

22.    Embracing the spare time that retirement allowed him, Mr. Belding volunteered with non-profits and county organizations, such as United Way, the Food Bank, the Veterans of Foreign Wars, and the Greene County Conservation District Board.

23.    After a few years, Mr. Belding began noticing significant inefficiencies and shortcomings in Greene County's government, including budget mismanagement and political favoritism.

24.     In 2019, Mr. Belding decided to take leadership over improving the County and launched his campaign for a seat on the Greene County Board of Commissioners (the "Board"), focused on transparency, accountability, and fiscal responsibility.

25.     Mr. Belding won his election in late 2019 and took his oath of office as the Chairman of the Board on or around January 6, 2020.

26.     Mr. Belding and his fellow County leaders committed their tenure to increasing transparency, integrity, and accountability throughout the local government. This initiative was well received and joined by almost every official and department within the County—all except the District Attorney's Office.

### Russo is elected as District Attorney for Greene County, and conflict immediately ensues.

27.     In 2019, after a tumultuous campaign process, Russo was elected as District Attorney for Greene County with just 37.1% percent of the vote.

28.     He was sworn into office on or around January 6, 2020.

29.     From his first days in office, Russo opposed the County Commissioners' initiatives and efforts, resulting in numerous disputes.

30.     Within the first eighteen months of Russo's tenure as DA, a dozen employees either resigned or were terminated, including seasoned Assistant District Attorneys, clerical assistants, and detectives. Resigning employees pointed to Russo's misbehavior and misconduct as the reason for their departure, while Russo fired other long-serving County employees simply because he wanted change.

**Russo refuses to investigate missing marijuana plants.**

31.     In early 2020, the Greene County Board of Commissioners became aware that a licensed medical marijuana facility within the County had its license revoked and that a substantial amount of marijuana—4000 plants—were missing from the facility.

32.     As Board Chairman, Mr. Belding requested that Russo investigate the matter to locate the missing plants and ensure they had not been reallocated for illicit purposes.

33.     Russo refused, instructing the Board to stay out of his business and stating that he would not investigate the thousands of missing marijuana plants in his County.

**Russo ignores the County's alcohol policies.**

34.     In December 2020, Russo hosted a Christmas party in a location that the County was using for official government business and, despite County policies, served copious amounts of alcohol.

35.     Although the County Commissioners attempted to investigate and discuss this policy violation with Russo, Russo refused to attend any meetings and informed the Board that he did not have time for such matters.

36.     On another occasion, Russo became so intoxicated at the Greene County Country Club before noon on a weekday, when Russo was supposed to be performing his duties as District Attorney, that he had to call two of his office staff to retrieve him from the Country Club and take him home.

37.     In Spring of 2021, Russo was escorted from the Pennsylvania District Attorneys Association's annual meeting after a display of public intoxication and indecency that ended with Russo urinating from a balcony at the Omni Bedford Springs Resort.

38.     The next year, Russo was refused entry into the venue, leaving Greene County unrepresented at the annual meeting of District Attorneys.

**Russo fails to manage the County's Victim Witness Coordinator Program.**

39.     In May 2021, employees in the District Attorney's office sent a letter to the County's Human Resources director expressing concerns about an inappropriate (but purportedly consensual) relationship between Russo and the County's Victim Witness Coordinator ("VWC").

40.     In addition to outlining Russo's improper behavior with the VWC, the letter notified Human Resources that the VWC was not performing her job duties.

41.     In one instance, the VWC failed to inform a victim that her abuser was being released from incarceration, resulting in the victim encountering her abuser on the street without any warning. Russo and the VWC allegedly laughed about the matter when it was brought to their attention.

42.     The allegations made to Human Resources resulted in an internal investigation and, eventually, an outside investigation. The outside investigator prepared a dossier, referred to as "the Klink Report," that remains confidential.

43.     The VWC resigned from her position in late October 2021.

44.     She was the third person to hold this position during the first twenty-two months of Russo's tenure as District Attorney.

45.     In response to the concerns raised about the VWC's oversight and performance of duties, which also included a failure to fulfill grant reporting requirements, the Board transferred oversight and fund management of the VWC position from the District Attorney's Office to the County Commissioners' Office.

46.     This reorganization was coordinated through the County Commissioners' Office, two Greene County Solicitors, the Pennsylvania Commission on Crime and Delinquency (the "PCCD"), the Pennsylvania Office of Victims Advocates, and Greene County Court Administration.

47.     At the time, at least twelve of Pennsylvania's sixty-seven counties also organized their VWC position to be part of the County Commissioners' Office.

48.     Although Russo had specifically requested that Sarah Smith, a member of the County Commissioners' staff, maintain responsibility for the grant funding responsibilities of the VWC, Russo sent numerous cease-and-desist letters to the County Commissioners, including Mr. Belding, demanding that they return control of the VWC position to the District Attorney's Office.

49.     In a cease-and-desist letter dated January 19, 2022, Russo, using his official title of District Attorney of Greene County, threatened legal action against the County

Commissioners, including Mr. Belding, if they did not return control of the VWC position to the District Attorney's Office.

50.     Because cease-and-desist letters are generally a tool for the civil process, not criminal proceedings, it is unclear whether Russo, expressly speaking as District Attorney, was threatening a civil action or criminal penalties against the Commissioners.

51.     At the January 20, 2022 Salary Board Meeting (the "January 20 Meeting"), the Board voted and approved Ms. Smith's appointment as the VWC for Greene County.

52.     Russo attended the meeting and objected to Ms. Smith's appointment. He further claimed that he would not share necessary information with Ms. Smith unless she was an employee of his office.

53.     Russo's cease-and-desist letters and objections were publicized in the media on or about January 26, 2022, with Russo insisting to reporters that the Commissioners' actions violated state guidelines.

54.     When asked for a statement, Mr. Belding explained that this transition was necessary because the District Attorney's Office had been unable to keep this important position adequately staffed.

55.     On or about January 31, 2022, Russo informed reporters that he was launching a criminal investigation into the County Commissioners related to their allegedly illegal hiring of Ms. Smith.

56.     Because these threats were criminal in nature, they were threats against the Commissioners, including Mr. Belding, as private citizens.

57.     Specifically, Russo threatened possible charges including Unlawful Use of Computer, Tampering with Public Records or Information, Obstructing Administration of Law or Other Governmental Functions, and Unlawful Access to Stored Communications.

58.     On information and belief, Russo instructed Sams to pursue a criminal investigation against Mr. Belding related to the hiring of Ms. Smith.

59.     On information and belief, Russo advised Sams about the propriety of this investigation—or lack thereof.

60.     On information and belief, Russo and Sams entered into an agreement to investigate and, eventually, pursue criminal charges against Mr. Belding for the purpose of retaliating against Mr. Belding for his public statements regarding the VWC position.

61.     After approximately eight months as VWC, Ms. Smith resigned due to Russo's repeated threats of legal action and his refusal to share information necessary for her to fulfill her job duties.

62.     In fact, as he threatened during the January 20 Meeting, Russo withheld access to a computer, laptop, shredder, desk, iPad, cell phone, and other essential items from Ms. Smith, preventing her from performing her job duties.

63.     On October 18, 2022, the PCCD issued a letter to the County Commissioners and Russo outlining their growing concerns with Greene County's failure to provide quality assistance to victims. The PCCD emphasized that their concerns were related to the lack of cooperation between Russo and the VWC. As a result, the PCCD determined that it would withhold grant funding payments to Greene County until further notice and that it would only consider releasing funding if certain conditions were satisfied.

64.     On October 28, 2022, the County Commissioners returned the VWC position, including grant funding responsibilities, to the District Attorney's Office. The Commissioners explained that the VWC program had failed, as noted in the PCCD letter, because of Russo's lack of collaboration and cooperation, which prevented the VWC from providing quality services to crime victims.

**Russo seizes Stop the Bleed Kits from Greene County paramedics.**

65.     In September 2022, Sams obtained a search warrant for Stop the Bleed Kits that were stored in the Greene County Emergency Management Office.

66.     Stop the Bleed Kits contain the items necessary to control serious bleeding and prevent blood loss following traumatic injury. Each Kit contains items such as professional tourniquets, bleeding control dressing, gauze, sponges, shears, and gloves.

67.     On information and belief, Sams obtained this search warrant at the behest of Russo.

68.     Through Sams's actions, all of the Kits owned by Greene County were eventually brought under Russo's control and withheld from emergency medical response teams, including four Kits that were removed from a local ambulance.

69.     On September 22, 2022, Greene County officials filed a court action to demand the return of this lifesaving equipment and to quash Sams's search warrant.

70.     On October 14, 2022, the Court of Common Pleas for Greene County ordered that the Kits be returned.

71.     On or around October 17, 2022, in response to a request from the media, Mr. Belding explained that Russo held the County's only Kits in his office for more than three weeks, posing a danger to the community.

**Russo attempts to unilaterally establish and control a SWAT team.**

72.     Also in the Fall of 2022, Russo announced on social media that he was forming a special weapons and tactics ("SWAT") unit under the Greene County District Attorney's Office.

73.     On September 2, 2022, the County Commissioners instructed Russo to provide an operating procedures manual, training standards and capabilities, letters of agreement with adjacent police forces, funding strategies, insurance coverage, and procedures for handling complaints and internal investigations.

74.     Russo did not respond.

75.     On or about October 3, 2022, Russo named Sams as the team leader of the SWAT unit.

76.     Around that same time, Russo declared that the SWAT team was fully operational and declared himself "Command and Control" of the unit.

77.     The County Commissioners sent Russo a follow-up letter on November 21, 2022, again requesting additional information related to Russo's SWAT unit. The Commissioners set forth their legal and practical concerns with the SWAT unit.

78.     Russo did not respond.

79.     On December 21, 2022, the County Commissioners sent a third letter to Russo concerning his SWAT initiative, again requesting more information and explaining that the County would not recognize the SWAT unit as a municipal entity or indemnify the unit for its actions without further information and assurances.

80.     Russo did not respond.

81.     On January 3, 2023, Mr. Belding published an opinion editorial in the Observer Reporter related to Russo's SWAT team. *See* Mike Belding, *Greene D.A. Mum on SWAT Team*, Observer Rep., Jan. 3, 2023, http://tinyurl.com/yezrj599.

82.     Speaking as a citizen on a matter of public concern, Mr. Belding explained that Russo's SWAT team was a unilateral creation of Russo's making. He further explained that elected officials do not have the authority to independently build and operate a militia.

14

83.     Mr. Belding's opinion piece concluded by noting that "[a]lthough the D.A. may shirk his obligation to answer questions of the commissioners, he must be held accountable by the residents and taxpayers of the county."

84.     To date, the SWAT team has not been funded or approved by the County, and it does not engage in any activity—law enforcement related or otherwise.

**Russo makes false statements to the media about Mr. Belding.**

85.     Two days after Mr. Belding's op-ed was published, Russo addressed the press about charges against two individuals accused of forging court orders.

86.     In his statements, Russo inexplicably claimed that one of the defendants was formerly employed by Mr. Belding.

87.     Russo further claimed that the defendant was the seventh individual employed by Mr. Belding to be arrested for a crime.

88.     These statements are flagrantly untrue.

89.     In fact, under the organizational structure of the County, no one works specifically for an individual Commissioner, and not one of the seven defendants referenced by Russo ever worked for Mr. Belding.

90.     On information and belief, Russo made these statements to retaliate against Mr. Belding for his op-ed regarding Russo's SWAT team.

91.     On information and belief, Russo's comments were intended to falsely associate Mr. Belding with criminal wrongdoing and threaten Mr. Belding's position as a Commissioner, including his ability to be reelected to office.

92.     In response to Russo's claims, the Board sent Russo an official request for information.

93.     In its letter, the Board explained the falsity of Russo's statements and requested the evidence or information that supported Russo's comments to the media.

94.     Russo never responded.

95.     On March 3, 2023, Mr. Belding filed a formal complaint with the Disciplinary Board of the Supreme Court of Pennsylvania related to Russo's false statements.

96.     Mr. Belding's complaint brought attention to a matter of public concern by notifying the Supreme Court of Pennsylvania of Russo's violations of the Rules of Professional Conduct.

97.     Russo became aware of Mr. Belding's filing on or about March 11, 2023.

98.     The Disciplinary Board of the Supreme Court of Pennsylvania confirmed receipt of Mr. Belding's complaint on March 13, 2023.

**Russo mishandles forfeiture account and threatens legal action.**

99.     In 2022, the Greene County Office of the Controller audited the Greene County District Attorney's §§ 5802 and 5803(a) Forfeiture Accounts.

100.    The audit revealed that Russo had improperly used forfeited and/or seized funds to purchase tactical gear for his unapproved SWAT team instead of for the Greene County Drug Task Force.

101.    The audit also revealed that, on at least two occasions, Russo did not comply with the Asset Forfeiture Statute's requirements for handling and accounting for asset forfeiture deposits.

102.    On September 30, 2022, the Office of the Controller issued its findings to the Pennsylvania Office of the Attorney General.

103.    On January 17, 2023, the chairman of the Greene County Republican Committee filed a right-to-know request for the audit, which was partially granted by two County solicitors and the Right to Know Officer, resulting in several pages of the audit being released.

104.    On February 18, 2023, Mr. Belding posted portions of the Controller's report not containing sensitive or confidential information to his personal Facebook page.

105.    On March 2, 2023, Sams sent a "Preservation Request" to the Greene County Information Technology Director, instructing the IT Director to preserve emails and other information sent and received by certain County officials between September 1, 2022 and March 2, 2023. The request specifically instructed that such data be preserved pending the issuance of a search warrant related to the release of confidential information.

106.    On information and belief, Sams issued the Preservation Request in coordination with Russo.

107.    Greene County officials understood this preservation demand to reflect an investigation into the release of the District Attorney's Office's audit.

108.    On information and belief, Sams knew that any investigation into the release of the audit was without merit and for the purpose of retaliation.

109.    On information and belief, Russo and Sams entered into an agreement to investigate and, eventually, pursue criminal charges against Mr. Belding for the purpose of retaliating against Mr. Belding for his public statements.

110.    On March 7, 2023, County Solicitor Eugene Grimm filed an action for declaratory judgment related to Russo's and Sams's investigation against County officials, explaining that the investigation was politically motivated and a conflict of interest.

111.    Mr. Belding signed the Verification of Declaratory Action.

112.    On March 11, 2023, Russo responded to the civil filing by issuing a written statement to the media stating:

> To say I am furious beyond measure with Mike Belding and his cronies' fabricated allegations would be an understatement. . . . Belding has surreptitiously and libelously used sensitive government documents in order to attempt to slander my name. . . . Belding and his cronies can be sure that this will be answered aggressively and swiftly and lawsuits will be filed against Belding regarding his action and behavior.

Mike Jones, *Greene Commissioners Ask Attorney General to Intervene in DA's Investigation*, Observer Rep., Mar. 11, 2023, http://tinyurl.com/2xah4w6a.

**Russo and Sams fabricate criminal charges against Mr. Belding.**

113.    On March 15, 2023, the Greene County Office of Registration and Elections conducted its casting-of-lots process to determine the position of names on the primary ballots.

114.    Shortly after the process concluded, the Greene County Republican Party Committee challenged the casting of lots because the County had failed to comply with the requirements of 25 Pa. Stat. § 2875. Namely, the public notice concerning the casting of lots had been advertised in only one, instead of two, newspapers.

115.    In response, the Elections Manager, Chief Clerk of the County, County Solicitor, and Mr. Belding, as Chairman of the Board, determined that the most appropriate remedy would be to properly advertise the casting of lots in two newspapers and recast the ballot positions.

116.    The recasting of lots was held on March 23, 2023.

117.    Because the other Board members were up for reelection, Mr. Belding, who was not seeking reelection, was the only County Commissioner present in his official capacity.

118.    Although Mr. Belding was present at the recasting, he did not oversee the meeting or exercise any authority throughout the process.

119.    Russo, who was seeking reelection to the Office of District Attorney and a member of the Republican party that challenged the original casting of lots, filed a written objection to the recasting of lots.

120.    Other candidates present, including Russo, refused to recast their lots.

121.    In response, the Greene County Elections Manager informed the candidates that those who refused to recast would be placed in the last position on the ballot.

122.    When four candidates, including Russo, still refused, the Elections Manager indeed placed them at the bottom of the ballot.

123.    Mr. Belding was not involved in this decision. He did not advise the Elections Manager to place objecting members at the bottom of the ballot, nor did he take any actions to implement the Election Manager's decision.

124.    On April 4, 2023, Sams filed a police criminal complaint and accompanying affidavit of probable cause against Mr. Belding related to the recasting of lots. The criminal complaint accused Mr. Belding of four counts of: "Failure to Perform Duty" (25 Pa. Stat. § 3548), "Hindering Performance of Duty" (25 Pa. Stat. § 3549), "Violation of Any Provision of Act" (25 Pa. Stat. § 3550), and "Official Oppression" (18 Con. Stat. § 5301).

125.    A true and correct copy of the police criminal complaint and affidavit of probable cause is attached as Exhibit A.

126.    On information and belief, Russo directed, advised, and assisted Sams on the investigation and coordinated with Sams to file criminal charges against Mr. Belding.

127. On information and belief, Russo and Sams planned and agreed to investigate and pursue criminal charges against Mr. Belding in retaliation for Mr. Belding's public statements against Russo.

128. Both Sams and Russo knew that there was no legal or factual basis to support an investigation or the allegations against Mr. Belding.

129. On information and belief, Russo authored all or part of Sams's affidavit of probable cause in support of the police criminal complaint against Mr. Belding, which Sams then signed as his own testimony.

130. The affidavit contained material misrepresentations and omissions, amounting to a false affidavit.

131. For instance, the only allegation of wrongdoing relevant to Mr. Belding is that "[b]y placing all candidates that objected to the second casting of lots at the bottom of the ballot, the Elections Board and Department failed to fulfill their duties of ensuring that each candidate had a lot cast, thereby showing preference to the non-objecting candidates with a preferred position on the ballot." Ex. A.

132. This allegation knowingly omits and/or misrepresents at least two key facts.

133. First, Sams misleadingly suggested that Mr. Belding caused objecting candidates to be placed at the bottom of the ballot. Both Russo and Sams, however, knew that the Election's Manager, not Mr. Belding, made the decision to place candidates who refused to draw their lot at the bottom of the ballot.

134.    The purposeful duplicity of Sams's allegations is obvious from the fact that, instead of making specific allegations against Mr. Belding, Sams averred that "the Elections Board and Department," collectively, "failed to fulfill their duties." In referring to the Elections Board and Department collectively, instead of providing the specific conduct of each actor, Sams intentionally misled the Court to believe that Mr. Belding committed the allegedly objectionable act.

135.    Sams's affidavit did not provide any specific allegations about specific conduct taken by Mr. Belding.

136.    Second, the affidavit's allegation of wrongdoing suggests that objecting candidates were placed on the bottom of the ballot simply because they raised an objection to the second casting of lots. This is grossly misleading. In fact, as both Sams and Russo knew at the time Sams filed the affidavit, objecting candidates were placed on the bottom of the ballot only if they refused to cast a lot. Further, those candidates were expressly informed by the Election's Manager that they would only be placed at the bottom of the ballot if they refused to cast a lot.

137.    In stating that "the Elections Board and Department failed to fulfill their duties of ensuring that each candidate had a lot cast," Sams omitted the fact that the objecting candidates made an independent, informed decision to not cast a lot despite instructions to do so. This omission leaves the misimpression that Mr. Belding prohibited

or otherwise interfered with candidates' ability to cast a lot when, in fact, Mr. Belding had no role at all in either the Election Manager's or the candidates' decision making.

138.    Sams's misstatements and omissions are material.

139.    But for the misleading allegations and omissions, there would have been no basis for criminal allegations against Mr. Belding.

140.    Without Sams's misleading statements and omissions, no court would have issued a criminal complaint against Mr. Belding.

141.    Russo's and Sams's exclusive purpose in investigating and bringing these false criminal charges against Mr. Belding was to retaliate against Mr. Belding.

142.    Because Russo was a candidate in the subject election, he had an actual conflict of interest in pursuing the criminal charges against Mr. Belding. After coordinating with Sams to initiate an investigation and file charges against Mr. Belding, Russo referred the case to the Pennsylvania Attorney General's Office. At the same time, Russo also informed reporters that the investigation was ongoing and more charges could be filed against Mr. Belding.

143.    As Professor Bruce Antkowiak, a law professor at St. Vincent College, opined, criminal charges over a ballot dispute such as this are exceptionally unusual. Instead, the normal course of proceedings would have been for the objecting candidates to file a civil lawsuit in the court of common pleas, as provided by 25 Pa. Stat. § 1602.

144.    On May 2, 2023, the Pennsylvania Attorney General's Office withdrew all charges against Mr. Belding, finding that the criminal complaint was not supported by probable cause.

**Russo used his office to file false criminal charges against numerous others.**

145.    The false charges against Mr. Belding are not the only instance in which Russo and Sams abused their power to retaliate against perceived enemies.

146.    Russo and Sams had a practice of pursuing criminal charges against their critics.

147.    For instance, at the same time Russo and Sams pursued criminal charges against Mr. Belding, they also filed criminal charges against County Solicitor Eugene Grimm related to the recasting of lots.

148.    The Pennsylvania Attorney General's Office withdrew all charges against Mr. Grimm, finding that the criminal complaint was not supported by probable cause.

149.    Grimm then filed suit against Russo for willful and gross negligence in the performance of his duty. After hearing all witness testimony, the Court of Common Pleas for Greene County found probable cause "that the Greene County District Attorney David Russo is guilty of willful and gross negligence in the performance of his duties." Opinion and Order, *Grimm v. Russo*, No. 36 Misc. 2023.

150.    The Court specifically observed that Russo used his power to bring criminal charges against Grimm, even though there was no "valid reason that charges would be

filed." The Court further highlighted that Russo had a clear conflict of interest in filing these charges and that he used "the power of prosecution . . . to achieve personal gain."

151.    The Court then appointed a special prosecutor to determine whether and information should be filed or Russo should be indicted for his willful and gross negligence. That matter remains pending.

152.    In the summer of 2022, Russo also filed criminal charges against three emergency management supervisors who had previously criticized Russo, accusing them of obstructing an investigation and multiple counts of tampering with evidence.

153.    Sams was the lead Detective in investigating and pursuing criminal charges against the emergency management supervisors.

154.    Russo promoted Sams to Chief Detective after charges were filed.

155.    On November 29, 2023, the Court of Common Pleas of Greene County dismissed the charges against all three emergency service providers, finding that there was "not a scintilla of evidence," much less probable cause, to support the charges and admonishing Sams for his deficient investigation.

**Mr. Belding decides to retire from public office;**
**Russo loses his position as DA.**

156.    Mr. Belding ran for public office because he recognized problems in his community and wanted to effectuate positive change.

157.    During his tenure as Chairman of the Board of Commissioners, which began in January 2020, Mr. Belding has led the County through the COVID-19 pandemic,

decreased government spending, promoted economic development, and raised awareness about government corruption.

158.    Despite Mr. Belding's efficacy as a leader for Greene County, he decided not to run for reelection.

159.    Local news outlets reporting Mr. Belding's decision specifically highlighted that, despite Mr. Belding's successes as Commissioner, Russo's ongoing feud with the Board over various issues had added years-long tumult to Mr. Belding's tenure.

160.    Mr. Belding's term will expire at the end of 2023. He looks forward to enjoying true retirement and spending more time with his family.

161.    Russo did run for reelection in 2023.

162.    However, he did not secure the Republican nomination, with his opponent receiving 72% of the vote.

163.    Russo's term will expire at the end of 2023.

### Injury to Plaintiff

164.    By interfering with Mr. Belding's constitutional rights, the Defendants have directly and proximately caused him significant harms, including but not limited to:

a.  Causing Mr. Belding to incur fees and expenses related to defending against the false charges lodged against him;

b.  Interfering with Mr. Belding's employment as a County Commissioner;

c.  Chilling Mr. Belding's ability to speak freely without fear of criminal retribution;

d.  Causing Mr. Belding severe stress and anxiety related to facing unfounded criminal charges and the risk of criminal punishment for crimes he did not commit;

e.  Causing reputational damage to Mr. Belding by using the media to falsely associate Mr. Belding with others charged with criminal activity and implying that Mr. Belding was similarly involved in criminal misconduct;

f.  Causing reputational damage to Mr. Belding by falsely labeling him a criminal and perpetuating that falsehood in the media;

g.  Depriving Mr. Belding of his faith in the criminal justice system in Greene County, a place he calls home.

h.  Forcing Mr. Belding to endure an unconstitutional process.

### Causes of Action

**Count I**
**42 U.S.C. § 1983 – First Amendment**
**(Retaliatory Use of Media by Russo in His Individual Capacity)**

165.    Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

166.    The First Amendment to the U.S. Constitution prohibits government officials from retaliating against individuals for exercising their constitutionally protected rights, including their right to freedom of speech.

167.    The First Amendment is applied to States through the Fourteenth Amendment.

168.    It is clearly established that threatening criminal charges and legal action is retaliatory conduct.

169.    It is clearly established that making statements to the press is not part of the prosecutorial function of a district attorney.

170.    Between January 2022 and March 2023, Mr. Belding engaged in constitutionally protected speech when making public statements regarding Russo's various acts of misconduct and incompetencies, including on or around: (1) January 20, 2022, when Mr. Belding spoke in connection with the decision to hire Ms. Smith as VWC; (2) January 26, 2022, when Mr. Belding explained why the VWC position was being removed from the DA's purview; (3) October 17, 2022, when Mr. Belding explained the impropriety of Russo keeping Stop the Bleed Kits from emergency care providers; (4) January 3, 2023, when Mr. Belding published an op-ed concerning Russo's unilaterally created SWAT team; (5) February 18, 2023, when Mr. Belding posted non-confidential portions of Russo's audit to his personal Facebook page; (6) March 3, 2023, when Mr. Belding filed a formal complaint with the Disciplinary Board of the Supreme Court of

Pennsylvania; and (7) March 7, 2023, when Mr. Belding signed the Verification of Declaratory Action against Russo.

171.   Between January 2022 and May 2023, Russo made false statements and/or threatened criminal charges or legal action against Mr. Belding on at least four occasions.

172.   On or about January 26, 2022, four days after Mr. Belding's statements during the January 20 Meeting, Russo publicized his cease-and-desist letters and insisted that Mr. Belding was violating state law by reorganizing control of the VWC position and hiring Ms. Smith.

173.   On or about January 31, 2022, five days after Mr. Belding explained to the media why the VWC position was being removed from Russo's purview, Russo informed reporters that he was launching a criminal investigation into Mr. Belding for criminal activity such as Unlawful Use of Computer, Tampering with Public Records or Information, Obstructing Administration of Law or Other Governmental Functions, and Unlawful Access to Stored Communications.

174.   On or about January 5, 2023, two days after Mr. Belding filed an op-ed outlining his concerns with Russo's SWAT team, Russo knowingly made false statements in the press about Mr. Belding. Specifically, Russo, speaking as District Attorney, knowingly made false claims that an individual charged with forgery was an employee of Mr. Belding's and that she was the seventh individual employed by Mr. Belding to be arrested for a crime.

175.    On or about March 11, 2023, in direct response to Mr. Belding's Facebook post and signing of a Verification of Declaratory Action against Russo, Russo declared that he was "furious beyond measure with Mike Belding" and that Mr. Belding would "be answered aggressively and swiftly and lawsuits [would] be filed against Belding regarding his action and behavior."

176.    Russo made these false statements and public threats of criminal investigation in direct response to and in retaliation for Mr. Belding's speech with the intention of falsely associating Mr. Belding with criminal wrongdoing.

177.    Russo's threats and false statements wrongly associated Mr. Belding's tenure as Commissioner with criminal wrongdoing, damaging his reputation, undermining his official position, and threatening his reelection potential.

178.    Russo's threats of criminal investigations and use of media to falsely associate his enemies with criminal wrongdoing would chill a person of ordinary firmness from speaking out against Russo.

179.    But for Mr. Belding's constitutionally protected speech, Russo would not have made false statements against or threatened Mr. Belding.

180.    Individually, each of Russo's retaliatory statements and threats to the media constitutes a First Amendment violation.

181.    Collectively, Russo's repeated use of the media demonstrates a campaign of harassment and intimidation against Mr. Belding in retaliation for Mr. Belding exercising his First Amendment rights.

182.    Russo abused his power as Greene County District Attorney to retaliate against Mr. Belding for Mr. Belding's constitutionally protected speech, causing the harms outlined in Paragraph 164.

**Count II**
**42 U.S.C. § 1983 – First Amendment**
**(Retaliatory Investigation by Russo in His Individual Capacity)**

183.    Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

184.    The First Amendment to the U.S. Constitution prohibits government officials from retaliating against individuals for exercising their constitutionally protected rights, including their right to freedom of speech.

185.    The First Amendment is applied to States through the Fourteenth Amendment.

186.    It is clearly established that initiating an investigation in retaliation for First Amendment activity violates the Constitution.

187.    It is clearly established that district attorneys are not serving a prosecutorial function when they advise or assist law enforcement regarding investigative conduct.

188.    Between January 2022 and March 2023, Mr. Belding engaged in constitutionally protected speech when making public statements regarding Russo's various acts of misconduct and incompetencies, including on or around: (1) January 20, 2022, when Mr. Belding spoke in connection with the decision to hire Ms. Smith as VWC; (2) January 26, 2022, when Mr. Belding explained why the VWC position was being removed from the DA's purview; (3) October 17, 2022, when Mr. Belding explained the impropriety of Russo keeping Stop the Bleed Kits from emergency care providers; (4) January 3, 2023, when Mr. Belding published an op-ed concerning Russo's unilaterally created SWAT team; (5) February 18, 2023, when Mr. Belding posted non-confidential portions of Russo's audit to his personal Facebook page; (6) March 3, 2023, when Mr. Belding filed a formal complaint with the Disciplinary Board of the Supreme Court of Pennsylvania; and (7) March 7, 2023, when Mr. Belding signed the Verification of Declaratory Action against Russo.

189.    In response to Mr. Belding's constitutionally protected speech, Russo launched at least three criminal investigations against Mr. Belding.

190.    First, in January 2022, Russo informed the media that he was launching a criminal investigation into Mr. Belding after Mr. Belding criticized Russo's oversight of the VWC position, and, on information and belief, Russo advised and assisted Sams in pursuing such a criminal investigation.

191.    Second, in March 2023, Russo advised and assisted Sams in pursuing a criminal investigation against Mr. Belding after Mr. Belding posted non-confidential portions of an audit to his personal Facebook page.

192.    Third, in March and April 2023, Russo advised and assisted Sams in pursuing a separate criminal investigation against Mr. Belding after Mr. Belding posted non-confidential portions of an audit to his personal Facebook page, filed a disciplinary complaint against Russo, and signed the Verification of Declaratory Action against Russo.

193.    On April 4, 2023, Sams, in coordination with Russo, knowingly filed a false criminal complaint and accompanying affidavit against Mr. Belding.

194.    On information and belief, Russo authored all or part of Sams's affidavit of probable cause against Mr. Belding, which Sams's then signed as his own testimony.

195.    The Pennsylvania Attorney General's Office ultimately dismissed all charges against Mr. Belding, finding a lack of probable cause.

196.    Russo directed, advised, and assisted Sams in all three investigations for the purpose of retaliating against Mr. Belding for his constitutionally protected activity.

197.    Retaliatory criminal investigations—and certainly repeated criminal investigations—would chill the speech of a person of ordinary firmness.

198.    Individually, each insistence of Russo directing, advising, and assisting Sams in pursuing a retaliatory criminal investigation constitutes a First Amendment violation.

199.     Collectively, Russo's repeated investigations demonstrate a campaign of harassment and intimidation against Mr. Belding in retaliation for Mr. Belding exercising his First Amendment rights.

200.     Russo violated Mr. Belding's constitutional rights by advising and assisting Sams in pursuing criminal investigations to retaliate against Mr. Belding for his First Amendment activity, causing the harms outlined in Paragraph 164.

### Count III
### 42 U.S.C. § 1983 – Fourteenth Amendment
### (Selective Investigation by Russo in His Individual Capacity)

201.     Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

202.     Mr. Belding's right to be treated equally to those similarly situated to him is guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

203.     Government officials are forbidden from enforcing generally unenforced laws against select individuals in retaliation for their engagement in constitutionally protected activity or without a rational basis for their disparate treatment.

204.     Yet, on at least three occasions, Russo advised and assisted Sams in pursuing unfounded criminal investigations against Mr. Belding for alleged crimes that are generally unenforced against similarly situated individuals.

205.     Russo did not have a legitimate reason for pursuing criminal investigations against Mr. Belding.

206.     Russo did not advise or assist Sams in pursuing criminal investigations against individuals similarly situated to Mr. Belding, but who were not the subject of Russo's animosity.

207.     Russo's investigatory advisement and assistance can be easily separated from any interest in protecting the health or safety of the County and its residents.

208.     First, there was no rational basis for the January 2022 investigation related to the VWC position. For instance, at least twelve other counties entrust oversight of the VWC position to their boards of commissioners, as the Board pursued here. Further, the decision to move the VWC position to the County Commissioner's Office was made in connection with numerous State and Local officials, yet only the three members of the Board who had spoken against Russo were investigated.

209.     Second, there was no rational basis for the March 2023 investigation related to the partial release of Russo's audit. Notably, Russo targeted this investigation at the County Commissioners, including Mr. Belding, even though County Commissioners are not involved in the day-to-day of processing right-to-know requests.

210.     Third, there was no rational basis for the March and April 2023 investigation related to the recasting of lots. For instance, criminal investigations and charges related to election proceedings are exceptionally unusual, particularly because

Pennsylvania law provides a civil process for remedying any missteps in election processes. Further, Russo did not advise or assist Sams in investigating the Greene County Elections Manager, even though the Elections Manager, not Mr. Belding, oversaw and made all final decisions during the recasting process.

211.    Russo purposefully and irrationally treated Mr. Belding differently from similarly situated individuals by advising and assisting Sams to selectively pursue criminal investigations against Mr. Belding.

212.    But for Russo's animosity against Mr. Belding, Russo would not have advised or assisted Sams in pursuing these investigations.

213.    In selectively directing, advising on, and assisting in criminal investigations against Mr. Belding, Russo violated Mr. Belding's constitutional rights, causing the harms outlined in Paragraph 164.

### Count IV
### 42 U.S.C. § 1983 –First Amendment
### (Retaliatory Prosecution by Sams in His Individual Capacity)

214.    Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

215.    The First Amendment to the U.S. Constitution prohibits government officials from retaliating against individuals for exercising their constitutionally protected rights, including their right to freedom of speech.

216.    The First Amendment is applied to States through the Fourteenth Amendment.

217.    It is clearly established law that law enforcement officials may not pursue criminal charges against an individual in retaliation for constitutionally protected speech.

218.    Sams personally benefitted from his relationship with Russo and had a personal interest in Russo's continued tenure as District Attorney.

219.    Between January 2022 and March 2023, Mr. Belding made multiple public statements regarding Russo's various acts of misconduct and incompetencies.

220.    In direct response to and relation for Mr. Belding's statements, Russo spoke to the press in his capacity as District Attorney, declaring that he was "furious beyond measure with Mike Belding" and promised that Mr. Belding would "be answered aggressively and swiftly and lawsuits [would] be filed against Belding regarding his action and behavior."

221.    On information and belief, Russo then coordinated with Sams to pursue a criminal investigation and criminal charges against Mr. Belding in retaliation for Mr. Belding's First Amendment activity.

222.    On April 4, 2023, Sams knowingly filed a false criminal complaint and accompanying affidavit against Mr. Belding, accusing him of crimes related to the casting of lots.

223.    Sams's affidavit contained material misstatements and omissions, which Sams knew were false or grossly misleading.

224.    Notably, pursuing criminal charges related to a ballot dispute is exceptionally unusual, as Pennsylvania law provides a civil remedy for objecting candidates.

225.    In fact, Sams did not pursue criminal charges against similarly situated individuals, such as the Elections Manager.

226.    Sams filed this criminal complaint and accompanying affidavit knowing that he did not have probable cause to pursue criminal charges against Mr. Belding.

227.    Sams only filed this criminal complaint against Mr. Belding to retaliate against Mr. Belding for his statements and expressions against Russo.

228.    The Pennsylvania Attorney General's Office dismissed the charges against Mr. Belding, finding that the charges lacked probable cause.

229.    Sams abused his power to retaliate against Mr. Belding for Mr. Belding's constitutionally protected speech, causing the harms outlined in Paragraph 164.

### Count V
### 42 U.S.C. § 1983 –Fourteenth Amendment
### (Selective Prosecution by Sams in His Individual Capacity)

230.    Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

231.    Mr. Belding's right to be treated equally to those similarly situated to him is guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

232.    Government officials are forbidden from enforcing generally unenforced laws against select individuals in retaliation for their engagement in constitutionally protected activity or without a rational basis for their disparate treatment.

233.    Yet, on April 4, 2023, Sams knowingly filed a false criminal complaint and accompanying affidavit against Mr. Belding, accusing him of crimes related to the recasting of lots.

234.    Notably, pursuing criminal charges related to a ballot dispute is exceptionally unusual, as Pennsylvania law provides a civil remedy for objecting candidates.

235.    In fact, Sams did not pursue criminal charges against similarly situated individuals.

236.    For instance, Sams did not file criminal charges against the Greene County Elections Manager related to the recasting of lots, even though the Elections Manager oversaw and made all final decisions during the recasting process.

237.    Sams did not have a rational basis for treating Mr. Belding differently from similarly situated individuals; instead, he was motivated entirely by animus.

238.    But for Sams's animosity against Mr. Belding, Sams would not have pursued criminal charges against Mr. Belding.

239.    The Pennsylvania Attorney General's Office dismissed the charges against Mr. Belding, finding that the charges lacked probable cause.

240.    Sams violated Mr. Belding's constitutional rights by selectively filing criminal charges against Mr. Belding, causing the harms outlined in Paragraph 164.

**Count VI**
**42 U.S.C. § 1983 – First Amendment**
**(Conspiracy to Retaliate by Sams and Russo in Their Individual Capacities)**

241.    Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

242.    The First Amendment to the U.S. Constitution prohibits government officials from retaliating against individuals for exercising their constitutionally protected rights, including their right to freedom of speech.

243.    The First Amendment is applied to States through the Fourteenth Amendment.

244.    Between January 2022 and March 2023, Mr. Belding made multiple public statements regarding Russo's various acts of misconduct and incompetencies.

245.    In March 2023, Russo and Sams entered into an agreement to investigate and pursue criminal charges against Mr. Belding in retaliation for Mr. Belding's speech.

246.    On information and belief, Russo directed, advised, and assisted Sams in his investigation of Mr. Belding.

247.    On April 4, 2023, Sams knowingly filed a false criminal complaint and accompanying affidavit against Mr. Belding, accusing him of crimes related to the casting of lots.

248.    On information and belief, Russo authored all or part of the affidavit of probable cause against Mr. Belding, which Sams then signed as his own testimony.

249.    As a result of Sams' false complaint and affidavit, criminal charges were brought against Mr. Belding.

250.    The Attorney General's Office dropped these charges, finding they lacked probable cause.

251.    Through their agreement and actions, Russo and Sams conspired to investigate and pursue criminal charges against Mr. Belding in retaliation for Mr. Belding's First Amendment activity and to deprive Mr. Belding of his freedoms through criminal prosecution, causing the harms outlined in Paragraph 164.

### Count VII
### 42 U.S.C. § 1983 – First Amendment
### (Conspiracy to Selectively Pursue Criminal Investigations and Charges by Sams and Russo in Their Individual Capacities)

252.    Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

253.     Mr. Belding's right to be treated equally to those similarly situated to him is guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

254.     Government officials are forbidden from enforcing generally unenforced laws against select individuals in retaliation for their engagement in constitutionally protected activity or without a rational basis for their disparate treatment.

255.     Yet, in March 2023, Russo and Sams entered into an agreement to launch a criminal investigation and pursue criminal charges against Mr. Belding for alleged crimes that are generally unenforced against similarly situated individuals.

256.     Without any legitimate reason for doing so, Russo and Sams agreed to pursue criminal investigations that are not pursued against similarly situated individuals who are not the subject of Russo's animosity.

257.     On April 4, 2023, Sams knowingly filed a false criminal complaint and accompanying affidavit against Mr. Belding, accusing him of crimes related to the recasting of lots.

258.     On information and belief, Russo authored all or part of the affidavit of probable cause against Mr. Belding, which Sams then signed as his own testimony.

259.     As a result of Sams's false complaint and affidavit, criminal charges were brought against Mr. Belding.

260.    The Attorney General's Office dropped these charges, finding they lacked probable cause.

261.    But for their animosity against Mr. Belding, Russo and Sams would not have coordinated to investigate and pursue these unfounded charges.

262.    Russo and Sams conspired to selectively investigate and pursue criminal charges against Mr. Belding to deprive him of his freedom through criminal prosecution, causing the harms outlined in Paragraph 164.

**Count VIII**
**42 U.S.C. § 1983 – First Amendment**
**(Policy of Retaliation by the District Attorney's Office and Greene County)**

263.    Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

264.    The First Amendment to the U.S. Constitution prohibits government officials from retaliating against individuals for exercising their constitutionally protected rights, including their right to freedom of speech.

265.    The First Amendment is applied to States through the Fourteenth Amendment.

266.    The District Attorney's Office manages, controls, and directs the Office of the Greene County Detective, including former Chief Detective Zachary Sams.

267.    Russo, as District Attorney, is a policymaker for Greene County.

268.    Between January 2022 and March 2023, Mr. Belding made multiple public statements regarding Russo's various acts of misconduct and incompetencies.

269.    In direct response to and relation for Mr. Belding's statements, Russo spoke to the press in his capacity as District Attorney, declaring that he was "furious beyond measure with Mike Belding" and promised that Mr. Belding would "be answered aggressively and swiftly and lawsuits [would] be filed against Belding regarding his action and behavior."

270.    On April 4, 2023, Sams, in coordination with Russo, filed a false criminal complaint and accompanying affidavit against Mr. Belding, accusing him of crimes related to the casting of lots.

271.    Notably, pursuing criminal charges related to a ballot dispute is exceptionally unusual, as Pennsylvania law provides a civil remedy for objecting candidates.

272.    In fact, the County did not pursue criminal charges against similarly situated individuals, such as the Elections Manager.

273.    Sams filed this criminal complaint and accompanying affidavit knowing that he did not have probable cause to pursue criminal charges against Mr. Belding.

274.    Sams only filed this criminal complaint against Mr. Belding to retaliate against Mr. Belding for his statements and expressions against Russo.

275.    Russo, as District Attorney, pursued the criminal charges against Mr. Belding in retaliation for Mr. Belding's constitutionally protected speech.

276.    The Pennsylvania Attorney General's Office dismissed the charges against Mr. Belding, finding that the charges lacked probable cause.

277.    This instance of retaliatory prosecution is just one example of Russo and Sams pursuing criminal investigations and charges against Russo's critics without probable cause.

278.    On at least four other occasions, Russo and Sams pursued retaliatory investigations and charges against individuals, including County Solicitor Grimm and three emergency management supervisors.

279.    The charges against all four individuals were ultimately dismissed for lack of probable cause.

280.    As a final policymaker, Russo's retaliatory actions against Mr. Belding are attributable to the District Attorney's Office and Greene County.

281.    Further, by repeatedly pursuing criminal investigations and charges against Russo's critics without probable cause, Russo and Sams created a Greene County policy or custom of pursuing false criminal charges in retaliation for constitutionally protected activity.

282.    The District Attorney's Office and Greene County's policy of retaliatory investigation and prosecution caused Mr. Belding the harms outlined in Paragraph 164.

**Count IX**
**42 U.S.C. § 1983 –Fourteenth Amendment**
**(Policy of Selective Enforcement by**
**the District Attorney's Office and Greene County)**

283.    Mr. Belding realleges and incorporates the allegations in Paragraphs 1 through 164 of this Complaint as if fully stated herein.

284.    Mr. Belding's right to be treated equally to those similarly situated to him is guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

285.    Government officials are forbidden from enforcing generally unenforced laws against select individuals in retaliation for their engagement in constitutionally protected activity or without a rational basis for their disparate treatment.

286.    Yet, the District Attorney's Office and Greene County—acting through Russo and Sams—adopted and enforced a policy or custom of selectively enforcing laws against Russo's critics.

287.    On April 4, 2023, Sams knowingly filed a false criminal complaint and accompanying affidavit against Mr. Belding and County Solicitor Grimm, accusing them of crimes related to the recasting of lots.

288.    Notably, pursuing criminal charges related to a ballot dispute is exceptionally unusual, as Pennsylvania law provides a civil remedy for objecting candidates.

289.    In fact, Sams did not pursue criminal charges against similarly situated individuals who are not targets of Russo's animosity.

290.    For instance, Sams did not file criminal charges against the Greene County Elections Manager related to the recasting of lots, even though the Elections Manager oversaw and made all final decisions related to the recasting process.

291.    Sams did not have a rational basis for treating Mr. Belding differently from similarly situated individuals; instead, he was motivated entirely by animus.

292.    But for Sams's animosity against Mr. Belding, Sams would not have pursued criminal charges against him.

293.    The Pennsylvania Attorney General's Office dismissed the charges against Mr. Belding, finding that the charges lacked probable cause.

294.    In addition to Mr. Belding, Russo and Sams have worked together to selectively enforce laws against at least four other individuals based on nothing more than Russo's and Sams's animosity.

295.    For instance, Russo, with Sams's assistance as Chief Detective, brought charges against Solicitor Grimm and three emergency management supervisors with whom Russo had a contentious relationship.

296.    The charges against all four individuals were dismissed for lack of probable cause.

297.    Russo is a final policymaker for the County, and in exercising his final authority, he made a deliberate choice to adopt a course of action that caused Mr. Belding to be treated differently from similarly situated individuals.

298.    As a municipal policymaker, Russo's actions described in this Complaint represent the District Attorney's Office's and the County's policies or customs.

299.    The District Attorney's Office and Greene County also ratified this discriminatory policy by permitting Russo and Sams to repeatedly pursue unfounded criminal charges against Russo's perceived enemies.

300.    Mr. Belding is entitled to protection from selective enforcement and to relief for the harms outlined in Paragraph 164.

## Prayer for Relief

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment: (1) declaring that the Defendants violated Plaintiff's rights under the First and Fourteenth Amendment to the United States Constitution; and (2) awarding him compensatory and punitive money damages against David Russo, Zachary Sams, and Greene County, Pennsylvania. Plaintiff also seeks his attorney fees and costs under 42 U.S.C. § 1988, as well as all other further relief as the Court may deem just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 21, 2023          Respectfully submitted,

/s/ Alexa L. Gervasi

Alexa L. Gervasi (PA 334530)
James W. Kraus (PA 56881)
Turahn L. Jenkins (PA 201267)
KRAUS JENKINS PLLC
1001 Liberty Ave., 5th Floor
Pittsburgh, PA 15222
Tel.: (412) 546-0780
Fax: (412) 546-0785
Email: agervasi@krausjenkins.com
       jkraus@krausjenkins.com
       tjenkins@krausjenkins.com

*Attorneys for Plaintiff, Mr. Michael Belding*